**DEBBIE D. KELLY,**

        **Plaintiff,**

**-vs-**                          **Case No. 6:08-cv-1751-Orl-19DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## I. BACKGROUND

### A.    Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on December 16, 2005, alleging an onset of disability on December 31, 2003, due to atypical chest pain, hypertension, and osteoarthritis. R. 27, 41, 88-90. Her application was denied initially and upon reconsideration. R. 41-44, 56-65. Plaintiff requested a hearing, which was held on May 6, 2008, before Administrative

Law Judge Arthur W. Stacy (hereinafter referred to as "ALJ"). R. 466-97. In a decision dated May 29, 2008, the ALJ found Plaintiff not disabled as defined under the Act through the date of the decision. R. 24-36. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 15-21.

The Appeals Council granted Plaintiff's request for review, finding that the ALJ had not adequately addressed Plaintiff's obesity and degenerative joint disease of the left knee. R. 461-64; R. 10. On August 12, 2008 the Appeals Council issued its Notice of Appeals Council Action stating that it was reviewing the ALJ's decision and that it was prepared to issue a decision finding that Plaintiff was capable of performing sedentary work but permitting her to send more evidence within 30 days of the date of its Notice. R. 461-64. On August 29, 2008 Plaintiff submitted more evidence and a statement about the side effects of medications. R. 424-60. On September 16, 2008, the Appeals Council issued a new decision finding that Plaintiff was not disabled at any time through May 29, 2008, the date of the ALJ's decision. R. 6-12. Plaintiff filed this action for judicial review on October 9, 2008. Doc. No. 1.

**B.      Medical History and Findings Summary**

Plaintiff was born on April 28, 1959, and was forty-four years old at her alleged onset date of December 31, 2003. R. 35, 88, 468. Plaintiff obtained a high school diploma (R. 35, 112, 469) and had past relevant work as a cleaner, as a presser in a laundry, and as a janitor at Lakeside Alternatives in 2006. R. 109, 469.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of high blood pressure, morbid obesity, gastroesophageal reflux disease (GERD), and sleep apnea. R. 108, 471, 474. After reviewing Plaintiff's medical records and Plaintiff's testimony, the Appeals Council found that Plaintiff suffered from atypical chest pain, obesity, degenerative joint disease of the left knee, and history of hypertension, which were "severe"

medically determinable impairments, but were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 9-12. The Appeals Council determined that Plaintiff retained the residual functional capacity (RFC) to perform a full range of sedentary work[1]. R. 11-12. In making this determination, the ALJ found that Plaintiff's allegations regarding her limitations were not totally credible for the reasons set forth in the decision. R. 32. Considering Plaintiff's vocational profile and RFC, the Appeals Council applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and concluded that Plaintiff could perform work existing in significant numbers in the national economy. R. 12. Accordingly, the Appeals Council determined that Plaintiff was not under a disability, as defined in the Act, at any time before May 29, 2008, the date of the ALJ's decision. R. 12.

Plaintiff now asserts three primary points of error. First, she argues that the ALJ erred by finding she had the RFC to perform sedentary work contrary to the opinion of her treating primary care physician. Second, Plaintiff contends the ALJ and the Appeals Council erred by omitting findings about the side effects of her medications on her ability to work. Third, she asserts that the ALJ and the Appeals Council erred in failing to make findings concerning whether Plaintiff's obesity imposed significant work-related limitations on her ability to perform sedentary work. For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The

---

[1]Although Plaintiff was employed as a janitor subsequent to her alleged onset date of December 31, 2003, the ALJ concluded that this janitorial work did not constitute disqualifying substantial gainful activity.  R. 33.

Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work)

prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III.  ISSUES AND ANALYSIS

### A.     RFC and the opinions of the physicians

Plaintiff claims that the ALJ should not have found her able to perform sedentary work in light of limitations assigned by her treating physician, Dr. Ying,[2] who opined on January 9, 2006 that Plaintiff's medical conditions prevented her from working since October 2005. R. 150.  Plaintiff also contends that the ALJ failed to give Dr. Ying's opinion the appropriate weight as her treating physician.  The Commissioner argues that the ALJ properly discounted Dr. Ying's opinion because it was not accompanied by objective medical evidence and was a conclusory opinion on an issue reserved to the Commissioner.

In a letter dated January 9, 2006, Dr. Ying of Pine Hills Family Health Center wrote a letter at Plaintiff's request:

> To Whom It May Concern,
>
> This letter is being generated in response to patient's request to have a statement outlining her ability to work.
>
> This patient's medical conditions have prevented her from working since October 2005.  She was examined today and is still unable to return to work.
>
> Duration: 12 months
>
> Diagnoses Abnormal EKG, Hypertension, Morbid Obesity, Anemia, and GERD.
>
> Sincerely,

---

[2]The records of other physicians refer to Dr. Michael Ham-Ying as Dr. Ying; for simplicity the Court will refer to him as Dr. Ying.

Michael Ham-Ying, MD, FAAFP (with signature)
Pine Hills Family Health Center

R. 150.

Plaintiff contends that the ALJ failed to properly refute Dr. Ying's opinion; thus, it should be accepted as true as a matter of law. Doc. No. 13 at 14. Apparently in the alternative, Plaintiff argues that the ALJ did not accord sufficient weight to Dr. Ying's opinion, giving more weight to the opinion of the consulting physician, Dr. Perdomo. Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff argues that the ALJ's findings were not supported by substantial evidence. The ALJ rejected Dr. Ying's opinion stating:

> The undersigned has considered and accords little weight to the opinions of Dr. Ham-Ying who reported that medical conditions had prevented the claimant from working

since October 2005, and that she still was unable to return to work. The report was generated in response to the claimant's request to outline her ability to work.

The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. *Additionally, the doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive.*

R. 34 (emphasis added)[3]. Plaintiff argues that "there is no evidence in the record either that [Plaintiff] was insistent or demanding in seeking Dr. Ying's opinion or that the doctor provided his opinion to avoid unnecessary doctor-patient tension." Doc. No. 13 at 13. Plaintiff also alleges that the ALJ's statements about Dr. Ying's motivation to write the January 9, 2006 letter is evidence of the ALJ's bias against Plaintiff and Dr. Ying.

First, the ALJ's decision does not show bias against Plaintiff or Dr. Ying. "Opinions formed on the basis of facts or events arising during the current or prior proceedings are not grounds for a recusal motion unless they display deep seated favoritism or antagonism." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Plaintiff cites *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996) in which the Court ordered remand to a different ALJ because the ALJ had made improper statements implying that a particular doctor "always found a disability" and this compromised the process. *Cf. Hartnett v. Apfel,* 21 F. Supp. 2d 217, 222-23 (E.D. N.Y. 1998) (ordering remand to a different ALJ without expressly finding bias, because of the ALJ's "troubling measure of insensitivity," and because the ALJ mischaracterized and misunderstood evidence). Although the ALJ pointlessly speculates as to

---

[3]The Appeals Council ("AC") adopted most of the ALJ's findings (and added two severe impairments – obesity and degenerative joint disease of the left knee) but left the ALJ's findings as to the treating physician intact and without comment. R. 11.

the "motivations" behind Dr. Ying's letter on Plaintiff's behalf, it does not appear to the Court, and Plaintiff has not shown, that the ALJ was biased to the extent it affected Plaintiff's due process rights.

Second, ascertainment of Dr. Ying's underlying "motivation" in issuing the letter at Plaintiff's request is not even relevant or necessary to the ALJ's decision; rather, the standard in this Circuit is whether the treating physician has merely made conclusory statements which are inconsistent with other objective evidence of the Plaintiff's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). In this case, the ALJ clearly stated his finding that Dr. Ying's "opinion is without substantial support from other evidence of record, which obviously renders it less persuasive." R. 34.

In a lengthy analysis, the ALJ pointed to other objective medical evidence in the record – from the consulting examiner, Dr. Perdomo, *and* from Plaintiff's own treating pulmonary specialist, Dr. Masood – which contradicted Dr. Ying's opinion, precisely as the ALJ is required to do under the Eleventh Circuit standard:

> In support of this conclusion, the undersigned references the lack of significant findings by the consultative examination. Upon physical examination, Dr. Perdomo reported that the claimant was pleasant, alert, and oriented times three in no acute distress. She was observed walking down the hall without any difficulties, without any assistive device for ambulation. She sat comfortably during the examination and was able to get on and off the examining table without any problem. . . . The heart had regular rhythm with no gallops or murmurs. . . . The extremities revealed no edema, cyanosis, clubbing, or ulceration with good distal pulses. There was bilateral knee crepitus with peripatellar tenderness, left worse than right; however, there also was full range of motion of the upper and lower extremities. She could stand on toes and heels with no major problem. The back revealed no deformities or tenderness. There was full range of motion of the cervical and thoracolumbar spine. The straight leg raise test was negative. The neurological examination showed normal sensory, motor, and deep tendon reflexes. her coordination and station was normal. There were no gait deficits with negative Romberg. Her grip strength and fine manipulation was normal. Her mental-status examination was also normal. [R. 185-86].

> Additionally, Dr. Perdomo opined that the claimant could stand/walk for 6 hours in an 8-hour workday; could sit for 8 hours; could frequently lift/carry 25-30 pounds; and should avoid squatting or kneeling as well as repetitive stair climbing. The

undersigned accords considerable weight to Dr. Perdomo's opinion as stated above.

Moreover, upon physical examination, Dr. Masood [Plaintiff's treating pulmonary specialist] reported that the claimant appeared comfortable, cooperative, well-nourished, alert, awake, oriented times three, and in no distress. The head and face were normocephalic and without tenderness to palpation. The neck revealed no jugular venous distention. Her respiratory effort was normal with equal chest expansion. The lungs were clear to auscultation, and without wheezing or crackles. The abdomen was soft with positive bowel sounds and no tenderness, hepatosplenomegaly, masses, or bruit. There was no tenderness, swelling, or effusion in any joint in the hands or feet, and no abnormalities in the wrists, elbows, ankles, or knees. There was no evidence of pain or deformity in long bones or arms or legs. Musculoskeletally, there were no bony deformities or kyphoscoliosis. The extremities revealed no edema, clubbing, or cyanosis. There was full range of motion in all four extremities. There were no areas of muscle atrophy, swelling, and/or tenderness in the trunk, abdomen, back, arms or legs. The back was straight, non-tender along the spinal processes, and full range of motion. The lymph nodes were no palpable in the neck, supraclavicular, and axillary areas. The pulses were equal and bilaterally palpable. Her judgment was appropriate. The chest x-ray films showed well inflated lungs without infiltrates or effusions. The cardiac silhouette was normal. Finally the radiograph of the chest dated May 23, 2007, showed that heart size was stable with clear lungs. There was no acute cardiopulmonary abnormality (Ex. 13F/6 [R. 330]).

R. 34-35 (citing R. 346-368). The ALJ also determined that Plaintiff had been prescribed and had taken appropriate medications for the alleged impairments, which weighed in her favor, but the medical records revealed that the medications had been relatively effective in controlling her symptoms. R. 33.

Other medical records further support the ALJ's decision (dated May 29, 2008) and the AC's decision (dated September 16, 2008), and contradict Dr. Ying's January 2006 diagnoses of abnormal EKG, hypertension, morbid obesity[4], anemia, and GERD. R. 12, 36. The abnormal EKG was from a test administered four years before, in 2002. According to a cardiologist who was going to treat Plaintiff, Dr. Gross[5], Plaintiff subsequently had a treadmill test, and an echocardiogram, cardiac

---

[4]Plaintiff's arguments concerning her impairment of obesity is analyzed in detail below.

[5]Plaintiff refused to see Dr. Gross and called Orange County Medical Clinic to "express her displeasure" because "he did not run any test on her and just told her to lose weight" – 100 pounds. R. 305, 307. She requested a different

(continued...)

catheterization, all of which showed completely normal coronaries. R. 306. He also noted that Plaintiff's hypertension was under control at the time of his examination in October 2005, although there were times when Plaintiff was not taking her medication. R. 307; 236 (June 2006), R. 179 (not taking medication – September 2004); 191-92 (August 2005).

Plaintiff's chest pain was eventually diagnosed – not as a cardiac condition at all, but as costochondritis, or the inflammation of a rib or the cartilage connecting a rib, which is a common cause of chest pain and is considered harmless chest wall pain. R. 326-28; *see* w w w . w e b m d . c o m / p a i n - m a n a g e m e n t / c o s t o c h o n d r i t i s; www.mayoclinic.com/health/costochondritis/DS00626.

Plaintiff saw Dr. Tarver at Orlando Heart Center in June 2006, and he noted that Plaintiff did not exercise, she continued to eat fried food, and did not practice portion control, thus, she was continuing to gain weight; she also still smoked despite shortness of breath. R. 235. Dr. Chapman of Orlando Heart Center, who saw Plaintiff at Orlando Regional Healthcare System Emergency Room on May 29, 2007, noted that Plaintiff was told by her primary physician (not a specialist) Dr. Ying that due to an abnormal EKG she had "ischemic heart disease." R. 328. However, he also noted when Dr. James Tarver performed cardiac catheterization in 2002 it was normal, and Plaintiff had a normal two-day Myoview Persantine scan in 2006. R. 327. Thus, Dr. Chapman (heart specialist) opined that Plaintiff's chest pain syndrome was musculoskeletal, and reproducible to touch. R. 327. He did not believe that it was coronary artery disease given the normal results on the cardiac tests and a normal echocardiogram; he opined that the probability of ischemic event occurring was less than 1%. R. 328-29, 333 (duplicate). There is little mention made of Plaintiff having anemia, and there is no mention of any limitations from anemia. In progress notes from Orlando Heart Center in

April 2002, the doctor noted that Plaintiff's GERD had improved with Protonix medication.  R. 258.

The treatment notes of Dr. Masood (Plaintiff's pulmonologist) along with the consultative examination of Dr. Perdomo directly contradict the opinion of Dr. Ying that Plaintiff was "disabled." Dr. Perdomo opined that Plaintiff would be able to stand and walk six hours and sit six hours during an eight-hour workday with normal breaks; and would be able to lift and carry up to 25-30 pounds (avoiding squatting, kneeling, and stair climbing), which would allow for the performance of a full range of sedentary work.  R. 185-86.  The ALJ's rejection of Dr. Ying's opinion (and the AC's incorporation of the ALJ's finding on the issue) was supported by substantial evidence.  Accordingly, good cause existed for the ALJ's failure to credit Dr. Ying's opinion concerning Plaintiff's limitations.

Plaintiff also argues that the AC erred in failing to address the one-page *non*-SSA form completed by Dr. Masood on July 8, 2008, in which he answered "yes" to four questions indicating that Plaintiff could not work due to fatigue:

> In your opinion, are these symptoms and limitations consistent with the medical signs and findings you have observed:
>
> - The inability to sit upright in a chair for four hours (or more) in an eight-hour workday five days a week due to fatigue and shortness of breath;
> - The need to lay down or recline most of the time due to fatigue and medication side effects;
> - Extreme fatigue;
> - Inability to perform any job eight hours per day five days per week on a reliable and sustained basis.

R. 14.  Dr. Masood added in a handwritten comment: "Patient has sleep apnea, hypersomnia and shortness of breath/hyperactive airway."  R. 14.

Although Plaintiff argues that the AC did not consider Dr. Masood's July 2008 form, in the AC's decision, it explained that it notified Plaintiff and counsel on August 12, 2008 that it had granted

the request for review and it "would consider any comments or new and material evidence" that Plaintiff wanted to submit within 30 days from the notice. R. 9. The decision states "Comments and additional evidence have been received and considered (AC-1)" and the August 7, 2008 correspondence from Plaintiff's counsel is immediately behind the AC decision in the record[6]. R. 13-14.

Plaintiff contends that the AC erred in not reversing the ALJ's decision based on new and material evidence from Dr. Masood submitted to the AC more than two months *after* the ALJ's May 29, 2008 decision. When a plaintiff submits additional evidence to the Appeals Council and the Appeals Council denies review, the court must determine whether the Commissioner's decision is supported by substantial evidence on the record as whole. *See Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262, 1266 (11th Cir. 2007); *Hummel v. Astrue*, No. 8:06-CV-725-T-EAJ, 2007 WL 2492460, *7 (M.D. Fla. Aug. 30, 2007) (under *Ingram*, the court reviews whether the decision to deny benefits is supported by substantial evidence in the record as a whole, including evidence submitted to the Appeals Council).

The Commissioner contends Dr. Masood's opinion on the check-the-box form that Plaintiff experiences extreme fatigue due to sleep apnea/hypersomnia is inconsistent with his treatment records during the relevant period showing that Plaintiff's "moderate" sleep apnea had improved with use of the Bilevel Positive Airway Pressure ("BiPAP") machine by October 2007. R. 352, 366. The Court agrees that Dr. Masood's treatment notes do not support the limitations on the form he completed in July 2008.

---

[6]Although Dr. Ying's treatment notes from March 26, 2007 are part of the record (R. 313-24), a letter from Dr. Ying that Plaintiff "was medically optimized" for knee surgery and a prescription paper from Dr. Billy Thompson, M.D. of Community Health Centers, Inc. opining "this patient is not able to work due to medical reasons" are not part of the administrative record, but counsel attached them as exhibits to Plaintiff's brief. Doc. No. 13-2. Plaintiff's counsel submitted additional evidence on August 29, 2008. R. 384-460.

Dr. Masood's treatment notes report that Plaintiff was diagnosed with obstructive sleep apnea and asthma; she began treatment with Dr. Masood in 2006. R. 363, 369. Plaintiff was started on a Continuous Positive Airway Pressure ("CPAP") machine in fall 2006. R. 360. However, in February 2007, Plaintiff was only using the CPAP for about 3-6 hours per night and only for four to five days per week because she said she was having difficulty tolerating it and she was taking it off during the night, so she was only sleeping three to four hours per night. R. 363, 367. Dr. Mobin (in practice with Dr. Masood) "strongly recommended to use the [CPAP] every night and throughout the night." R. 367. She "promised to show better compliance with CPAP therapy." R. 367. At her visit one month later in March 2007, Dr. Masood noted that Plaintiff had been using the CPAP "fairly regularly and compliantly," although Plaintiff was not using the humidification unit properly because she was not aware of how to operate it. R. 361. Her exertional shortness of breath was related to and secondary to her underlying obesity and deconditioning. R. 360. He noted that there might be an element of exercise-induced bronchospasm and asthma but she had been responding to some extent to bronchodilators and her nebulizer, although symptoms had not fully resolved. R. 360. Her nebulizer was helping and she was improving slowly; her GERD was not being treated because she had run out of medications. R. 363. Dr. Masood changed Plaintiff's prescription to a BiPAP at a different pressure level which he believed would likely improve her comfort and her "compliance with regards to her pressure tolerance." R. 361. He also discussed implications of weight gain and weight loss with her, in addition to other measures such as sleeping on the side, avoiding alcohol at bedtime, and elevating the head at 20 to 30 degrees. R. 361.

By May 29, 2007, Plaintiff reported to Dr. Masood that she liked the BiPAP much better, and was tolerating it more nicely, and was able to sleep more hours at night; her daytime symptoms were beginning to improve. R. 357. Her mask broke but she was in the process of getting it fixed. R. 357.

Dr. Masood noted her compliance had improved and she was using the BiPAP for the most part of the night with improvement in her daytime symptoms of tiredness and fatigue. R. 357. "She is pleased with her progress, and is looking forward to continuing to use her [BiPAP]." R. 357. Her intermittent bronchospasm/cough and wheezing with exertional shortness of breath responded to the bronchodilators and the nebulizer and he planned to continue those medications. R. 357.

By August 2007, she continued to tolerate the BiPAP "much better" than the initial CPAP, but she still needed time to acclimatize to it fully. R. 355, 357. Plaintiff told Dr. Masood that she was beginning to sleep better and her daytime symptoms of tiredness and fatigue were also somewhat better. R. 354A. He was concerned that she had gained some more weight which was "concerning with reference to her sleep apnea." R. 354A. Dr. Masood continued the bronchodilators even though he suspected that she was not responding fully because there was an element of deconditioning and obesity. R. 355. In October 2007, Dr. Masood again noted that Plaintiff was responding to the bronchodilator treatment for her hyperactive airways. R. 352. "Overall, she has been pleased with the change towards BiPAP and seems to be tolerating it much better, and daytime symptoms are beginning to improve." R. 352. At the appointment in January 2008 – about six months before Dr. Masood filled out the check-the-box form, his treatment notes state that Plaintiff was able to tolerate her BiPAP better but was out of her nebulizer medication. R. 349. Her hyperactive airways seemed to be maintained with Advair and nebulizer treatment. R. 350.

For the first time after more than eighteen months of treatment, in March 2008, Dr. Masood notes that Plaintiff's "sleep hygiene is poor." R. 345. She "usually goes to bed at 8:00 P.M. and wakes up at 7:00 A.M. states after the nocturnal awakenings, she . . . admits problems going back to sleep, usually falls asleep in 30 minutes, admits difficulty falling asleep, states upon awakening she feels groggy, morning headaches and unrefreshed, having problems acclimating to CPAP/BiPAP, is

reporting no oral air leak with CPAP/BiPAP, admits daytime sleepiness, complains of daytime sleepiness after lunch, reading and watching TV, weight today 328 lbs and weight at time of last visit was 319 lbs." R. 345. Plaint had incorrect mask given to her at Colonial Medical, and Dr. Masood planned to order a correct one because Plaintiff had "not been able to use the [BiPAP] machine," thus she was "still symptomatic from her [sleep apnea]." R. 346. Plaintiff was advised to lose weight and, along with other measures repeated from previous visits, Dr. Masood specifically recommended to her to "improve CPAP/BiPAP compliance" and he reviewed "her sleep hygiene and related issues." R. 347.

Over an eighteen month period, Plaintiff consistently continued to show improvement (after initial adjustments) from use of the BiPAP machine and bronchodilators (Advair and nebulizer). Dr. Masood was also critical of Plaintiff's "poor sleep hygiene" and her lack of compliance with his treatment plan, which had not improved by the time of the hearing in May 2008 despite his discussion with her in March 2008. R. 347. Plaintiff testified at the hearing that she was "pretty much exhausted" and that she "used [the machine] *every* night pretty much." But then qualified her answer: "I think, at the most, if I'm not on it throughout the week, it's *probably two days* out of the week." R. 475 (emphasis added). Dr. Masood's treatment notes contradict his opinion and, when viewed over the eighteen months of treatment, indicate that Plaintiff repeatedly reported her symptoms improving and her fatigue decreasing, halted only when she was non-compliant, whether because she had the wrong-size mask, did not know how to use the humidifier, or because the mask broke, as cited above. The AC's refusal to modify the ALJ's determinations as to Dr. Masood's findings prior to May 29, 2008, and the AC's refusal to credit Dr. Masood's unofficial check-the-box form were based on substantial evidence.

### B. Side effects from medications

Plaintiff argues that the ALJ erred in failing to elicit testimony and make findings about the side effects of her medications on her ability to work, despite more than 40 pages in the record listing her medications. She also argues that the AC made findings about the side effects of medications which were not supported by substantial evidence.

As an initial matter, the heightened duty to develop the record that Plaintiff cites from *Cowart v. Schweiker,* 662 F.2d 731, 737 (11th Cir. 1981), applies when claimants are not represented; in this case Plaintiff was represented at the administrative hearing by counsel who had the opportunity, and did, elicit relevant testimony from her regarding her limitations. The ALJ determined that Plaintiff had not alleged any side effects from the use of medications (R. 33), and Plaintiff concedes that the electronically filed written disability reports filed with the SSA are not significantly to the contrary. She argues instead that these written disability reports (R. 94-106, 125-31) should be ignored because they are unsigned and "there is no evidence that Plaintiff can type" and the reports are undated. Plaintiff's responses were recorded electronically as part of the SSA efforts to maintain electronic files, and Plaintiff cites no evidence that the lack of side effects was not the answer she gave in completing these disability reports.

Plaintiff cites as evidence of side effects the ALJ should have considered her testimony at the hearing: "[B]ecause I'd be in pain throughout the day, all day. I take plenty of medication. You know, I sleep – I have to sleep through things with all the medication that I take. I'm asleep half the day so there's nothing much that I can do." R. 471. Plaintiff actually testified that she was sleepy during the day because of her sleep apnea, which was well documented in the record (and discussed at length above). R. 475.

The ALJ set forth the reasons he found Plaintiff's credibility about her impairments, which would include her testimony about side effects, to be "not credible" to the extent they were

inconsistent with the RFC for the reasons explained in the decision. R. 32. Where an ALJ decides

not to credit a claimant's testimony about symptoms, the ALJ must articulate specific and adequate

reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of*

*Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based

on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding

with substantial supporting evidence in the record. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858

F.2d 1541, 1545 (11th Cir. 1988).

> The ALJ stated:

> Although the claimant has described daily activities which are fairly limited, two
> factors weigh against considering these allegations to be strong evidence in favor of
> finding the claimant disabled. First, allegedly limited daily activities cannot be
> objectively verified with any reasonable degree of certainty. Secondly, even if the
> claimant's daily activities are truly as limited as alleged, it is difficult to attribute that
> degree of limitation to the claimant's medical condition, as opposed to other reasons,
> in view of the relatively weak medical evidence and other factors discussed in this
> decision. Overall, the claimant's reported limited daily activities are considered to be
> outweighed by the other factors discussed in this decision.

> Although the claimant has received treatment for the allegedly disabling
> impairment(s), that treatment has been essentially routine and/or conservative in
> nature. Additionally, although the claimant has received various forms of treatment
> for the allegedly disabling symptoms, which would normally weigh somewhat in the
> claimant's favor, the record also reveals that the treatment has been generally
> successful in controlling those symptoms. The claimant reported that she was
> beginning to sleep better and the daytime symptoms of tiredness and fatigue were
> somewhat better. She also was able to sleep more hours at night with improved
> daytime symptoms. She also reported that the nebulizer was helping. She stated that
> she was improving slowly. Moreover, the record reflects significant gaps in the
> claimant's history of treatment. . . . Given the claimant's allegations of totally
> disabling symptoms, one might expect to see some indication in the treatment records
> of restrictions placed on the claimant by the treating doctor. Yet a review of the
> record in this case reveals no restrictions recommended by the treating doctor.

R. 33. As discussed in the previous section regarding Plaintiff's daytime fatigue as a result of her

obstructive sleep apnea, Plaintiff's nighttime sleeping improved and her daytime symptoms were

reduced, as long as she was compliant with using the BiPAP machine and operated it properly with

the proper mask, etc. Plaintiff's nausea was attributed in the medical records to her GERD, which was under control, as long as she was taking her medications. R. 258, 363. The ALJ's finding that Plaintiff was not entirely credible as to her symptoms, and his reliance on her written disability reports listing no side effect of fatigue, were based on substantial evidence.

Moreover, as the Commissioner points out, the final decision subject to judicial review regarding the side effects of Plaintiff's medication is the AC's decision, not the ALJ's, because the AC modified the ALJ's decision. *See Ingram*, 496 F.3d at 1261 (citing 20 C.F.R. § 404.984). Plaintiff argues that the AC erred in not crediting her August 29, 2008 submission of "new and material" evidence in the form of pharmacy information sheets about the side effects of the medications she was prescribed; the information sheets listed side effects which included nausea and dizziness, headaches, drowsiness, dry mouth, and fatigue. R. 385-94.

The AC's decision addressed the pharmacy information sheets submitted by Plaintiff:

The claimant's representative also alleges that the [ALJ] did not properly consider the side effects of the claimant's medications. However, in the hearing dated May 29, 2008, the [ALJ] notes that the claimant has reported that she was sleeping better, that daytime symptoms of tiredness and fatigue were (somewhat) better and medications have bee relatively effective in controlling the claimant's symptoms. The [ALJ] also indicates in the hearing decision that the claimant has not alleged any side effects from the use of medications. The [AC] notes that an audit of the claimant's testimony reveals that she testified that her medications make her sleepy and that she needs to lie down most of the time in her bed. The [AC] has concluded that the medical evidence of record does not support the claimant's allegation that side effects of medication limits her to such a degree. In particular, a physician did not find that side effects of medication require the claimant to lie down or sleep on a daily basis for prolonged periods of time.

The representative contends that new and material evidence in the form of pharmacy information sheets for the claimant's medication supports her allegations regarding the side effects of medication. The [AC] notes that the side effects discussed on the pharmacy information sheets only indicate that these are "possible side effects" not "actual side effects." A medical report dated March 3, 2008 rules out a number of these side effects as current problems. After a review of the case file in its entirety, the [AC] finds that the evidence does not support a conclusion that the side effects of

medication further reduce the claimant's residual functional capacity from that found by the [ALJ].

At the initial and reconsideration determinations, medical consultants made findings of fact after reviewing the record in this case. These findings have become expert medical opinion which the [AC] considered in arriving at this decision.

R. 10-11.

Plaintiff argues these pharmacy information sheets are "new" evidence because they were not provided to the ALJ prior to the date of his decision, and the evidence is "material" because they show the potential side effects of Plaintiff's medications on her ability to work; thus, the AC should not have rejected the evidence. Plaintiff argues the AC did not apply the correct legal standards, because the issue is whether these medications as taken by Plaintiff, would reasonably be expected to cause her side effects, and the AC should not have made such a determination on what is essentially a finding of fact which should have been remanded to the ALJ to make a determination.

The AC considered the purportedly "new" evidence submitted by Plaintiff listing the *potential* side effects of her various medications and correctly found that these "possible side effects" were not "actual side effects." R. 11. Plaintiff fails to explain why the pharmacy information sheets for medications that she had been on for years are "new" evidence that could not have been provided to the ALJ prior to his decision.

Assuming *arguendo* that the evidence was "new and material," the AC appropriately discounted it. In determining that there was insufficient evidence that side effects of medication reduced Plaintiff's RFC, the AC also noted that no physician had found that side effects of medication required Plaintiff to lie down or sleep on a daily basis for prolonged periods of time. R. 10. The AC properly discounted the evidence because these side effects were only "possible side effects" listed in the pharmacy information sheets given to each customer with such prescriptions, and not "actual

side effects" that Plaintiff had the opportunity to present at the hearing or that the medical records would have reflected. R. 11. The AC's decision was based on substantial evidence.

### C. Impact of obesity on RFC

Plaintiff argues that neither the ALJ nor the AC made the requisite findings concerning whether Ms. Kelly's obesity imposes significant work-related limitations on her ability to perform sedentary work, citing Social Security Ruling 02-1p and *Walker v. Bowen*, 825 F.2d 996, 1001 (11 Cir. 1987). The Commissioner contends the AC properly evaluated Plaintiff's obesity in determining she retained the RFC to perform sedentary work activity.

According to Social Security Ruling (SSR) 02-1p, obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. *Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity*, 67 Fed. Reg. 57,859 (2002). "Individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* SSR 02-01p notes that obesity "often complicates chronic diseases . . . of the musculoskeletal body systems." Plaintiff argues that the ALJ and the AC failed to consider Plaintiff's obesity in determining whether she had a medically determinable impairment, whether her impairment was severe, and whether her impairment prevented her from doing past relevant work or other work in the national economy. Social Security Ruling 02-1p. Plaintiff contends that neither the ALJ nor the AC made specific findings about whether Plaintiff's obesity imposes significant work-related limitations on her ability to perform sedentary work.

As an initial matter, Plaintiff's argument about the ALJ's failure to discuss her obesity is beside the point. The AC specifically granted Plaintiff's request for review based on the ALJ's failure

to adequately address Plaintiff's obesity. R. 10. Thus, the AC's decision is the Commissioner's final decision on the issue, and the one that will be reviewed by the Court. *See Ingram*, 496 F.3d at 1261.

Plaintiff contends that although the AC found that Plaintiff's obesity was a medically determinable and severe impairment, the AC erred in finding that Plaintiff was still capable of sedentary work. In the AC's decision, the AC recognized that the ALJ had failed to address impact of Plaintiff's obesity and made those findings based on the medical records:

> The Council mostly agrees with the [ALJ']s findings under steps 1, 2 (*with the exception of obesity and degenerative joint disease i the left knee not being severe*), 3, 4, and 5 . . . The claimant has severe impairments: atypical chest pain, *obesity*, degenerative joint disease in the left knee, and a history of hypertension. . . . The [AC] also adopts the [ALJ's] conclusion that the claimant has the [RFC] for the full range of sedentary work. . . [and] the claimant can make a successful adjustment to other work. . . . However, the [AC] notes that the [ALJ] did not adequately address the claimant's obesity and degenerative joint disease of the left knee. The hearing decision notes that the claimant has been diagnosed as morbidly obese at 320 pounds. The [AC] notes that on April 23, 2008, the medical record indicates that the claimant weighed 330 pounds and was 58 inches tall, which equates to a body mass index (BMI) of 50.2. The National Institute of Health's Clinical Guidelines recognize three levels of obesity (BMI of 30 or above). Social Security Ruling (SSR) 02-1p states that per the Clinical Guidelines BMIs of 30.0-34.9 are classified as level I, BMIs of 35.0-39.9 are classified as level II, and BMIs greater than or equal to 40 are classified as level III, defined as "extreme" obesity. These levels describe the extent of obesity, but do not correlate with any specific degree of functional loss. The claimant has degenerative joint disease in her left knee. In December 2007, her complaints of soreness in the left knee area were noted by her treating physician. however, also noted were good range of motion, good strength and the joint was grossly stable. X-rays in June 2008 (new evidence) showed mild osteoarthritic changes. Although the claimant had some pain and mild crepitus, she still had a good range of motion and a stable joint.

R. 9-10 (emphasis added).

Plaintiff contends that the AC failed to assess the effect of Plaintiff's obesity on her ability to perform routine movement and necessary physical activity within the work environment, or whether her obesity caused other functional limitations and restrictions. To the contrary, the AC specifically addressed Plaintiff's obesity noting a BMI of greater than 40, or "extreme" obesity, but,

as the AC noted, BMI levels standing alone merely describe the extent of obesity and do not correlate with any specific degree of functional loss.  R. 10. Thus, the AC found that Plaintiff's obesity was a severe impairment, but also went on to discuss possible resulting functional limitations which would affect her ability to perform sedentary work activity.  R. 10.

In unpublished decisions, the Eleventh Circuit has affirmed denial of disability benefits where the record contains no evidence showing that the claimant's obesity affected her ability to perform work-related activities. *See, e.g., Wind v. Barnhart*, 133 Fed.Appx. 684, 690-91 (11th Cir. 2005); *Hennes v. Commissioner of Social Sec. Admin,* 130 Fed.Appx. 343, 348 (11th Cir. 2005).  Similarly, in a published decision of the Ninth Circuit, *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005), the claimant argued that the ALJ had not considered her obesity (5'4" and weighed 215 pounds) throughout the sequential evaluation process as required under SSR 02-1p, but the appellate court found that the claimant had not set forth any evidence that would support the diagnosis and findings of a listed impairment. *Burch*, 400 F.3d at 683.  The claimant testified that she experienced lower back pain that precluded her from standing, sitting, or walking for long periods and limited her daily activities, and the medical evidence showed that she had early degenerative disc disease mild to moderate obstructive pulmonary disease. *Id.*  As in this case, the claimant had not identified any evidence of *functional limitations* due to obesity which would have impacted the Commissioner's analysis, where the only evidence in the record relating to obesity were notes from doctors indicating that she was obese or had gained weight. *Id.* at 683-84.

In Plaintiff's case, although her physicians noted Plaintiff's height and weight and that she was  morbidly or extremely obese, none of them imposed functional limitations relating to her obesity.  Instead, the AC determined that, although Plaintiff complained in December 2007 of soreness in the left knee area, she maintained good range of motion, good strength and the joint was

grossly stable, and X-rays in June 2008 (new evidence) showed only mild osteoarthritic changes. R. 10. The AC properly considered the functional impact of Plaintiff's obesity as required under SSR 02-1p, and found that she was able to perform sedentary work.

## IV. CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her ailments to some degree. The ALJ and the AC appropriately considered Plaintiff's circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the Commissioner's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, it is respectfully **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g) and the Clerk of the Court be directed to enter judgment consistent with this opinion and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 14, 2010.

_David A. Baker_
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record